# United States Court of Appeals for the Federal Circuit

---

**MICROSOFT CORPORATION,**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

AND

**MOTOROLA MOBILITY, LLC,**
*Intervenor.*

---

2012-1445, -1535

---

Appeals from the United States International Trade Commission in Investigation No. 337-TA-744.

---

Decided: October 3, 2013

---

CONSTANTINE L. TRELA, JR., Sidley Austin, LLP, of Chicago, Illinois, argued for appellant. With him on the brief were DAVID T. PRITIKIN, RICHARD A. CEDEROTH, ELLEN S. ROBBINS and JOHN W. MCBRIDE. Of counsel on the brief were BRIAN R. NESTER and RYAN C. MORRIS, of Washington, DC. Of counsel were MICHAEL R.

FRANZINGER, of Washington, DC, and DOUGLAS I. LEWIS, of Chicago, Illinois.

MICHAEL LIBERMAN, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were DOMINIC L. BIANCHI, Acting General Counsel, and JAMES A. WORTH, Acting Assistant General Counsel. Of counsel was ANDREA C. CASSON.

CHARLES K. VERHOEVEN, Quinn Emanuel Urquhart & Sullivan, LLP, of San Francisco, California, argued for intervenor. With him on the brief were DAVID A. NELSON, of Chicago, Illinois; and EDWARD J. DEFRANCO, RAYMOND N. NIMROD and MATTHEW A. TRAUPMAN, of New York, New York.

---

Before RADER, *Chief Judge,* PROST, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Microsoft Corporation appeals from an order of the United States International Trade Commission that found no violation of 19 U.S.C. § 1337 insofar as Microsoft alleged that Motorola Mobility, Inc. (Motorola), infringed four of Microsoft's patents, U.S. Patent Nos. 6,578,054; 6,826,762; 7,644,376; and 5,664,133. The Commission found no infringement of those patents. As to three of the patents, the '054, '762, and '376 patents, the Commission also found no violation on an additional ground, namely, that Microsoft had not proved that there was a domestic industry relating to articles protected by the patents.

We affirm the Commission on three of the patents but reverse in part on the fourth. We affirm the finding that Motorola does not infringe the '054 patent, as well as the finding that Microsoft failed to prove that a domestic

industry exists for products protected by the '762 and '376 patents. As to the claims of the '133 patent that are at issue, however, we hold that the Commission relied on incorrect claim constructions in finding no infringement, the only basis for its finding no violation, for the main group of accused products, while we affirm the non-infringement finding for the accused alternative design. We therefore partly reverse the Commission's final determination as to the '133 patent and remand for further proceedings.[1]

BACKGROUND

In 2010, Microsoft filed a complaint in the Commission against Motorola. Microsoft alleged that Motorola had violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by importing mobile phones and tablets that infringe a number of Microsoft's patents. The Commission instituted an investigation and assigned the case to an administrative law judge. *In the Matter of: Certain Mobile Devices, Associated Software, and Components Thereof; Notice of Investigation*, 75 Fed. Reg. 68379-02 (Nov. 5, 2010).

After an evidentiary hearing, the ALJ found, as relevant to the present appeal, that the accused Motorola products did not infringe any of the asserted claims of the '054, '762, '376, or '133 patents. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at ii (Dec. 20, 2011) (Initial Determination). The ALJ also addressed whether Microsoft made a showing, required for relief under section 337, that an industry in the United States "relating to the articles protected by the patent[s] . . . exists or

---

[1] The Commission granted Microsoft relief based on another patent. That ruling is the subject of a separate appeal by Motorola.

is in the process of being established." 19 U.S.C. §§ 1337(a)(2), (3). To make that domestic-industry showing, Microsoft sought to rely on mobile devices allegedly loaded with the Microsoft Windows mobile operating system, in which Microsoft had invested substantial resources in the United States. But the ALJ found that Microsoft had failed to prove that the mobile devices on which it relied actually implemented the '054, '762, and '376 patents. *Certain Mobile Devices, Associated Software, and Components Thereof,* Inv. No. 337-TA-744, EDIS No. 467464, at 199, 203-08.

The Commission reviewed the ALJ's decision in part, allowing the unreviewed parts, including the non-infringement findings at issue here, to become Commission determinations. The Commission specifically upheld the ALJ's findings regarding Microsoft's failure to prove that the Microsoft-supported products on which it relied for its domestic-industry showing actually practiced the '054, '762, and '376 patents. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, USITC Pub. 4384, at 16 (Mar. 2013) (Final).

Microsoft appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(6).

DISCUSSION

A

We first address the Commission's finding of no section 337 violation based on the '054 patent.[2] Entitled "Method And System For Supporting Off-Line Mode Of Operation And Synchronization Using Resource State Information," the '054 patent discloses a system and

---

[2]    We sometimes use "Commission" when referring to ALJ determinations that the Commission left undisturbed and relied on for its ultimate disposition.

method for synchronizing copies of a data resource (*e.g.*, a calendar entry or document) in a client-server environment, where any of several clients (*i.e.,* computers or mobile devices) may make changes to its copy of that resource even when not connected to the server. '054 patent, col. 2, lines 49-53, 57-60. When a client receives a copy of a resource from the server, it also receives "resource state information." *Id.*, col. 16, lines 51-54. The resource state information "represents the state of the resource stored at the server at a selected moment." *Id.*, col. 16, lines 51-54. The client stores this copy (a local copy) so that the client can modify the resource even when it is not connected to the server. *Id.*, col. 16, lines 55-63. After a connection is reestablished with the server, the client transmits the resource and the resource state information stored at the client to the server. *Id.*, col. 16, line 64, through col. 17, line 3. The server then determines if the copy just received from the client "is the most current version of the data object or resource, and all copies of the data object are synchronized to the most current version." *Id.*, col. 3, lines 36-39.

Microsoft asserted independent claim 11 and dependent claims 13-15 of the '054 patent against Motorola. The dispute over infringement centered on claim 11's requirement of "resource state information." Although the parties agreed before the hearing that the term "resource state information" needed no construction, the ALJ concluded that the meaning of the term was actually in dispute and construed it to mean "information that is associated with a resource that allows the server, client computer, or both to determine the version of the resource stored on the server at a particular moment, and if there has been a change in the resource, and to take appropriate action to synchronize the documents if there has been a change." *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 40-41, 49. The ALJ explicitly noted that,

under his construction, "resource state information" did not necessarily require "a version number," but that it did require "some information to indicate the version of the resource." *Id.* at 49.

Based on that construction, the ALJ found that the accused products do not infringe the asserted claims of the '054 patent because they do not use "resource state information" for synchronization. *Id.* at 59-65. The accused products use a protocol called ActiveSync—initially designed and licensed by Microsoft for its enterprise server-side software application—to handle synchronization of data between mobile devices and Microsoft Exchange servers. The ActiveSync protocol uses a Sync Command to transmit three pieces of information: a resource field, identifier field, and state tag. The resource field contains the actual data of the resource, and the identifier field contains the ServerID, which is a unique identifier for the particular resource. The state tag indicates whether the state is "add," "change," or "delete," which the client or server sending the information uses to indicate whether the resource following the tag has been added, changed, or deleted. Microsoft's infringement argument, which the ALJ found to be inconsistently presented by Microsoft and its expert Dr. Smith, *id.* at 62-63, is that the state tag and identifier field together constitute the "resource state information" required by claim 11.

The ALJ found that Microsoft failed to prove that the Sync Commands were "resource state information." *Id.* at 62. The ALJ criticized Dr. Smith's testimony as "incredible and unreliable" because he did not tie his analysis of the claims to the specification or prosecution history, did not discuss two patents incorporated by reference into the '054 patent, and never clearly explained what the "resource state information" consisted of in the accused products. *Id.* at 63. The ALJ concluded that the standard Sync Commands "in no way, identify the version

of the resource at a given time" and, therefore, do not constitute "resource state information." *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 64. This is because "[a] standardized XML command does not provide any information that can identify the version of a resource"; it merely "command[s] the client or server to perform an action." *Id*. The Commission declined to review the ALJ's construction and non-infringement determination.

Microsoft argues on appeal that the ALJ improperly "construed [resource state information] to require additional information about the version of the resource, akin to a version number."[3] Microsoft has not presented on appeal an argument, which would have to proceed under the demanding substantial-evidence standard of review, that the ALJ could not find lack of infringement even under the ALJ's claim construction. All we fairly have before us is Microsoft's challenge to the ALJ's construction, which we review without deference. *Pass & Seymour, Inc. v. Int'l Trade Com'n.*, 617 F.3d 1319, 1323 (Fed. Cir. 2010).

Microsoft argues that the phrase at issue has a "plain meaning": "the current status of the resource"; "the current condition of the resource on the platform (*i.e.*, client or server) that sends the information." In our view, however, the term "state" is so general on its face that it begs for clarification from the specification regarding what aspect of the resource is to be identified. We conclude that the ALJ correctly understood "state" in the

---

[3] Microsoft sufficiently preserved this contention by arguing to the Commission that the ALJ had ultimately rejected infringement by improperly imposing its requirement of version information.

context of the whole patent as requiring information about the version of the resource.

Claim 11 describes "resource state information" as "representing the state of the resource stored at the server at a selected moment." '054 patent, col. 16, lines 52-54. The specification defines what is meant by "state": "The 'state' of the contents of a collection stored at a server refers to the identity of the current version of a resource stored at a server." *Id.*, col. 9, lines 19-21. The patent goes on to explain that "[a]s a particular resource stored at one or more servers undergoes a series of successive updates, the resource is considered to have passed through a corresponding series of states, each of which represents a single update version of the resource." *Id.*, col. 9, lines 23-27. And in summarizing the invention, the '054 patent explains that the "current state of the copy" in the client's local memory is used by the server to "determine[] if the copy in the client's cache is the most current version of the data object or resource . . . ." *Id.*, col. 3, lines 34-37.

The specification thus makes clear, consistent with the invention's function of synchronizing, that "resource state information" must provide information about the comparative recentness of a particular version. We therefore see no error in the ALJ's construction requiring some information that allows the server or client to determine which copy of the resource is the most recent so that it can take appropriate action to synchronize the resource if there has been a change to a copy of that resource. Finding no error in the ALJ's construction of "resource state information," we affirm the Commission's determination that the accused products do not infringe the '054 patent.

B

We also affirm the Commission's finding of no section 337 violation based on the '376 patent. Entitled "Flexible

Architecture For Notifying Applications Of State Changes," the patent discloses and claims a mechanism for notifying application programs about changes to the state of certain mobile-device components of relevance to those applications. '376 patent, col. 1, lines 30-60. Applications may, for example, benefit from having information about the current state of battery strength, network connectivity, or memory usage. *Id.*, col. 1, lines 36-39. Multiple applications may benefit from information about multiple "state properties." Instead of each application checking with each resource about its state, variables for multiple state properties are stored in a common data store to which a "notification broker" has access, and client applications register with that broker to receive notifications of changes in particular state properties relevant to that application. *Id.*, col. 79, lines 10-17; *see also id.* at col. 2, lines 32-34. The notification broker is "an underlying driver responsible for adding, updating, and removing data from a data store." *Id.*, col. 2, lines 39-41.

Microsoft asserted independent claim 10 and dependent claims 11-13 of the '376 patent against Motorola. Claim 10 includes the terms "notification broker" and "client applications," both of which were central to the parties' dispute before the Commission and now on appeal. The ALJ initially construed "notification broker" to mean "an underlying driver responsible for, at least, adding, updating, and removing data from a data store." *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 39. After recognizing that the parties disagreed about the meaning of "underlying driver," the ALJ determined that the term should be given its plain and ordinary meaning, which he concluded meant that the "identified driver must, at least, ***directly*** add, update, and remove data from the identified data store, which may be either hardware or software." *Id.* at 40 (emphasis added). Because of this construction requirement of "direct" access, the ALJ

found that Microsoft failed to show that the accused products contained a "notification broker." *Id.* at 91.

The ALJ also found that the accused products did not meet the "client applications" limitation of claim 10. The ALJ reasoned that the patent makes clear—including in claim language requiring that the "notification broker" "be coupled . . . to the clients"—that the required client applications could not simultaneously be part of the required notification broker. *Id.* at 92. The ALJ found that Microsoft's expert, Dr. Olivier, failed to identify claim applications (or, at least, more than one client application) outside the notification broker he identified. For example, Dr. Olivier identified the battery service as a client application, but the battery service is also a component of the notification broker. *Id.*

To establish a violation of section 337, Microsoft had to show not just infringement by Motorola's products but the existence of a domestic industry "relating to the articles protected by the patent." 19 U.S.C. §§ 1337(a)(2), (3). The ALJ determined that Microsoft failed to make that domestic-industry showing because it did not offer sufficient proof of articles that were actually protected by the patent. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 207. Microsoft's failing was simple. Although Dr. Olivier purported to identify "client applications" in an example application that Microsoft provides to third-party phone manufacturers, Microsoft failed to show that any such "client applications" are actually implemented on any third-party mobile device. *Id.* According to the ALJ, because Microsoft did not point to evidence that its expert examined client applications in fact running on third-party mobile phones or confirmed how they operated, Microsoft failed to show that there is a domestic industry product that actually practices the '376 patent. The Commission affirmed this determination. *Certain*

*Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, USITC Pub. 4384, at 18.

In this appeal, we do not reach Microsoft's challenge to the non-infringement determination because we find substantial evidence to support the Commission's finding of no domestic industry, which suffices to support its finding of no violation based on this patent. There is no question about the substantiality of Microsoft's investment in its operating system or about the importance of that operating system to mobile phones on which it runs. But that is not enough under the statute. Section 337, though not requiring that an article protected by the patent be produced in the United States, unmistakably requires that the domestic company's substantial investments relate to actual "articles protected by the patent." 19 U.S.C. §§ 1337(a)(2), (3). A company seeking section 337 protection must therefore provide evidence that its substantial domestic investment—*e.g.*, in research and development—relates to an actual article that practices the patent, regardless of whether or not that article is manufactured domestically or abroad. *InterDigital Commc'ns v. Int'l Trade Comm'n*, 707 F.3d 1295, 1299, 1304 (Fed. Cir. 2013).

We conclude that there is substantial evidence to support the Commission's determination that Microsoft failed to meet that requirement. Claim 10 of the patent requires, among other things, "client applications on the mobile device that are configured to automatically register notification requests and receive notifications in response to a change in a state property of the mobile devices for which they have registered" and a "notification broker on the mobile device that is coupled to the data store, the notification list, and the clients . . . ." '376 patent, col. 80, lines 17-21, 31-32. The Commission did not lack substantial evidence to support its finding that Microsoft simply failed to identify any actual phones with the required components performing as required. In so

concluding, we respect a fundamental limit on our role in reviewing evidentiary sufficiency where the finder of fact has applied proper legal standards: we do not say what the party with the applicable burden of proof could have proved, only what the finder of fact could permissibly find it did or did not prove.

Microsoft's expert testified that "[a] mobile device running Windows Mobile includes client applications on the mobile device that are configured to automatically register notification requests . . . and receive notifications . . . ." He also testified that "client applications" automatically register notification requests that "indicate when the clients should receive notifications. . . ." But the evidence he cited in support of his opinion that Windows Mobile phones practice the "client applications" limitation is the source code that Microsoft provides to mobile-phone manufacturers, rather than specific code actually installed and run on a particular third-party mobile device. Moreover, Microsoft provided no evidence that "Windows Mobile" phones always contain the entirety of Windows Mobile, rather than only portions. The ALJ thus could find that Microsoft lacked sufficient evidence about how client applications on actual "articles" operated.

On that basis, the Commission could find that Microsoft failed to show that any Microsoft-supported products practiced the '376 patent. We therefore affirm the Commission's finding of no proven domestic industry, and hence no section 337 violation, involving this patent.

### C

For similar reasons, we affirm the Commission's finding of no violation based on the '762 patent. Entitled "Radio Interface Layer in a Cell Phone with a Set of APIs Having a Hardware-Independent Proxy Layer and a Hardware-Specific Driver Layer," the '762 patent discloses a radio interface layer (RIL) between radio hardware and software applications in a cell phone. '762 patent, col.

1, lines 53-56. The RIL is designed to "allow[] applications running on an operating system in the cellular telephone to issue commands without knowledge of the underlying radio structure of the cellular telephone. . . ." *Id.*, col. 1, lines 60-65. To do so, the RIL contains two "layers": (1) a hardware-independent proxy layer, which is a software component that receives requests from client applications running on the phone and converts them into code that can be understood by the second (driver) layer, *id.*, col. 5, lines 2-4; *id.*, col. 23, line 66 through col. 24, line 6; and (2) a hardware-specific driver layer, which is a software component that receives requests from the proxy layer and generates commands for the specific radio. *Id.*, col. 2, lines 1-4.

Each of the asserted claims (1-9 and 15-16) requires an RIL that includes the "hardware-independent" proxy layer and the "hardware-specific" driver layer. At the time of the *Markman* hearing, the parties agreed to the construction of "hardware independent" as "without regard to a specific hardware implementation." After a dispute arose about whether Motorola was attempting to read additional limitations into the claim phrase, the ALJ clarified that "hardware independent" "does not require a complete lack of knowledge of the underlying hardware or prohibit any changes to the proxy layer based on the hardware," only that the proxy layer be independent of the "network characteristics" of the hardware. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 24, 31.

Relying on that construction, the ALJ found no infringement. Specifically, he found that the accused Motorola mobile devices, which contain telephony radios and run the Android operating system, did not contain the necessary "hardware independent" proxy layer. *Id.* at 84-87. The ALJ also found, and the Commission expressly affirmed, that Microsoft failed to show that there was a Microsoft-supported product that practiced the '762

patent and, hence, failed to meet the domestic-industry requirement of section 337. *Id.* at 203-06; *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, USITC Pub. 4384, at 18. That finding rested not on the requirement of a "hardware independent" proxy layer but on the requirement of a "hardware specific" driver. Microsoft relied on third-party mobile devices running Windows Mobile as articles that practice the '762 patent, which required Microsoft to show that the identified devices have a hardware-specific driver (software), in addition to the Windows Mobile 6.5 operating system. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 203. As with the '376 patent, however, the ALJ found that Microsoft failed to make the required showing for actual articles. Microsoft's expert, Dr. Olivier, relied on source code only for "an example driver layer" that Microsoft provides to third-party mobile-device manufacturers. The ALJ faulted Microsoft for providing "no evidence that its expert conducted any examination or analysis of the third-party software that is necessary to implement the claimed invention or in any way confirmed how the devices it relies on actually operate." *Id.* at 204-05.

There is substantial evidence to support the Commission's determination that Microsoft failed to meet the domestic-industry requirement because it did not offer sufficient evidence to prove that any third-party mobile device implements a hardware-dependent driver layer as required by the patent. Microsoft's expert, Dr. Olivier, analyzed only driver-layer code provided by Microsoft to third-party mobile-device manufacturers as something they could choose to load on their devices; he never analyzed the functionality of an actual driver layer implemented on a phone. And a witness testifying as Microsoft's representative under Fed. R. Civ. P. 30(b)(6) could not identify a single third-party mobile-device

manufacturer that implemented Microsoft's example driver-layer code.

Microsoft argues that one portion of Dr. Olivier's testimony—about the HTC HD2 phone running Windows Mobile 6.5—established that a Microsoft-supported phone practiced the '762 patent. The Commission could find otherwise. Dr. Olivier did not analyze the driver on the HD2 and demonstrate that its driver is hardware-specific. When discussing the driver layer, Dr. Olivier relied on Microsoft's sample RIL driver that works with GSM radios, rather than the actual driver layer code used in the HD2. And while he made reference to certain standard telephony commands that the HD2 may use, he did not establish that such use meant that the driver is hardware-specific. Under the deferential substantial-evidence standard of review, we cannot reverse the Commission's finding that Microsoft lacked sufficient proof that the actual driver layer in the HD2 is hardware specific.

In sum, the ALJ had a sufficient basis to find that Microsoft did not make the necessary showing about third-party software actually implemented on a mobile device running Windows 6.5. Because the Commission could find insufficient proof that the '762 patent covers the articles on which Microsoft relied to prove a domestic industry, it could properly find no section 337 violation. We therefore affirm that finding without reaching the issue of infringement.

## D

Finally, we address the Commission's finding of no section 337 violation based on the '133 patent. Entitled "Context Sensitive Menu System/Menu Behavior," the '133 patent generally discloses and claims a computer system having a graphical user interface that presents a set of representations corresponding to actual computer resources, including objects and containers, and offers

"context sensitive" menus for user interaction.[4]   '133 patent, col. 2, lines 47-50.  When a user selects a computer resource, such as a picture file, a "context menu" is automatically generated.  *Id.*, col. 10, lines 38-47.  This context menu has information of two types: it includes at least one selection relating to a class of objects to which that resource belongs (*e.g.*, the class of personal contacts, or of telephone numbers, or of pictures) and at least one selection associated with a container in which the selected computer resource resides (*e.g.*, the directory of contacts, or of telephone numbers, or of pictures).  *Id.*, col. 10, lines 47-54.  The menu, moreover, is displayed in a position in proximity to the selected computer resource.  *Id.*, col. 10, lines 54-56.

Microsoft asserted claims 1, 2, 35, and 36 of the '133 patent against Motorola.  Independent claim 1 requires

> retrieving a menu selection relating to a class of objects to which the selected computer resource belongs; and

> retrieving a menu selection associated with a container in which the selected computer resource resides; and

> displaying upon the display the set of menu selections in a menu positioned in the proximity of a graphical representation of the selected computer resource.

---

[4]   As explained by Microsoft, without contradiction by the other parties, an object is any distinct entity of data—for example, a document, spreadsheet, picture file, or audio file.  Brief for Appellant Microsoft at 17 n.2.  Containers are repositories where objects reside, such as folders, directories, and databases.  *Id.*

*Id.*, col. 10, lines 49-56. Independent claim 35 includes similar "related to" and "associated with" language, and similar proximity language, though it refers to an "object" instead of the "computer resource" and involves software for "adding" the claimed menu selections to the menu. *Id.*, col. 15, line 13 through col. 16, line 3. The parties have not identified any material difference in the direct-infringement issues raised by the two independent claims.

The ALJ construed "a menu selection relating to a class of objects" as "a choice or option in a menu based upon or determined by the class of objects to which the selected computer resource belongs." *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 68. He also construed "a menu selection associated with a container" as "a choice or option in a menu based upon or determined by the environment or context in which the selected computer resource resides." *Id.* Based on those constructions, the ALJ found that the accused products do not meet the retrieving or adding limitations because each application in the accused products acts only on a single class of objects. *Id.* at 70. Each accused application "provides the set of menu selections without regard to the class of objects (since it operates only on a single class of objects) and only changes selections in the context menu based on the container."[5] "The menu selections are 'static' and will appear regardless of what object or container has

---

[5] We understand the ALJ's conclusion to mean simply that each particular application always summons up the same menu (and does not vary it according to different objects), not that all applications (one for pictures, one for text messages, etc.) summon up the same menu. There is no evidence suggesting the latter, and all the evidence relied on by the ALJ (and by the Commission and Motorola here) says only the former.

been selected." For that reason, the ALJ concluded, they are not "based upon or determined by" the class of the object or the container as the claim (as construed) requires. *Id.* at 70-71.

The ALJ also found that the accused products do not meet the requirement for display of the menu in proximity of a graphical representation of the selected computer resource (or object). The parties agreed that the requirement means "displaying on the display the set of menu selections positioned at or near the location of a graphical representation" of the resource (or object). The ALJ ultimately concluded, however, that it is not enough to meet this requirement that the context menu is actually close to the graphical representation of the selected computer resource; rather, the ALJ concluded, the placement of the context menu in relation to the graphical representation of the selected resource must be "deliberate." *Id.* at 72. For that reason, the ALJ found that the context menu in the main group of accused products is not "positioned in proximity" to the selected computer resource, because the context menu in those products is always in the center of the screen and is not "deliberately" positioned near the on-screen representation of the selected computer resource. *Id.* at 71. For the other accused products, embodying an "Alternate Design," the ALJ found that the menu does not meet the "positioned in the proximity" requirement based on an additional interpretation of the requirement, namely, that the menu must not wholly obscure the graphical representation of the computer resource. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 72. On those grounds, the ALJ found no direct

infringement (or, therefore, indirect infringement), a finding the Commission adopted.[6]

The Commission's grounds for finding no infringement rest ultimately on its view of what the claims require. There is no dispute here about how the accused products work, only about what the claims require. These are matters of claim construction, which we review without deference. On a correct understanding of the claim requirements, we conclude, the main group of accused products infringe, but the alternative design does not.

As to the "retrieving" and "adding" limitations, the evidence is clear that the accused products contain at least two applications, each one of which, when a user summons a menu for an object, displays a menu that contains both an entry dependent on the particular object (say, a telephone number) and an entry concerning the container (say, the inclusion of the number in the contact-list folder). To use the language of the ALJ's own construction, a menu for a contact, for example, offers an option to email the person, which is an option "based upon or determined by" the fact that this object is a person with an email address (not, say, a picture), and another option to delete the contact from the list, which is an option "based upon or determined by" the file in which the listing resides.

---

[6]    The ALJ found the domestic-industry requirement satisfied for this patent, based on Microsoft's proof that certain mobile devices that run the Windows Mobile 6.5 operating system, specifically the LG Fathom, practice claim 1 of the '133 patent. *Certain Mobile Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744, EDIS No. 467464, at 201. The Commission declined to review that finding. Motorola has not challenged the finding as an alternative ground to support the Commission's denial of relief on the '133 patent.

A related example involves a menu for a call list (from the accused products), shown in an exhibit from trial annotated by Microsoft in its opening brief:



Fig. 133-2(A53483-85)

Brief for Appellant Microsoft at 55. The image shows that selecting an object produces a context menu that includes a menu selection associated with the class of objects (for a phone number, add to contacts; or call the number) and another associated with the container (environment or context) in which the object resides (remove from list). And it is undisputed that the menu selections change depending on the selected object: for example, a menu item about a contact will be to call the contact, which will not be an item on a photo-menu.

No more is required by the claim language or, even, the express construction adopted by the ALJ. An application gives menu choices, one based on the type of object, another based on the container. Although the ALJ seemed to think otherwise, the object-based choice is no less object-based just because what makes it object-based is the action that selecting it will perform (call a number, say, or open a photo). And nothing in the claim language or the express construction requires an individual appli-

cation itself to offer different menus for different objects or, what amounts to the same thing, to make an inquiry about a particular object once the application is launched to see which of several application-specific menus to display. The ALJ's non-infringement finding with respect to the "retrieving"/"adding" limitations rested entirely on incorrectly imposing such extraneous restrictions. Without those unwarranted additions, the limitations encompass the accused products—both the main group of products and the alternative design.

The "displaying" limitations also read on the main group of accused products, for which the Android operating system provides context menus that are centered on the screen and occupy most of it. It is undisputed that, at a minimum, the menu is often at or near the location of the selected object. On a small-screen device, that may always be so, because it may be effectively impossible to be anything but proximate, for lack of space.

The ALJ's sole basis for finding the display-in-proximity requirement not to be met for the main group of products was a notion of "deliberate" positioning that cannot be justified. No such notion is fairly found in the claim or the agreed-on construction. The claim does not require a user's choice about display; it plainly contemplates control of the display by built-in software, making the language of "deliberate" odd. Perhaps the ALJ meant that the software must make the menu-display location an explicit function of the location of the graphical representation of the selected object. But the claim speaks only of results, not the details of underlying functions. Nor would it support the ALJ's claim construction to observe that, on a small screen, the display may always be in proximity to the location of the object's representation.[7]

--------

[7]    As the illustration excerpted above suggests*, supra* p. 20, some context menus in the main group of ac-

Unavoidable proximity is still proximity. And in any event the practical consequence for small screens does not alter the evident meaning of the claim language, which is not limited to small-screen devices. This conclusion requires reversal of the '133 patent non-infringement judgment as to the main group of accused products.

We reach a different conclusion regarding Motorola's alternative design. The ALJ found the alternative design to be non-infringing based on his conclusion that, for the context menu to be in the proximity of the graphical representation of the selected object, the graphical representation must remain at least partly visible on the screen when the context menu appears. Noting that there is little to go on in deciding this question (the ALJ's analysis was just one sentence), we adopt the ALJ's construction.

The ALJ's construction adopts the meaning of the claim terms, and even of the slightly different terms of the agreed-on construction, that embodies the most natural understanding of the terms when read on their face. When we look to the rest of the patent for further enlightenment, we see that the drawings, in their only pertinent examples, show still-visible graphic representations of the selected objects. The specification offers nothing further of significance and, in particular, nothing specifically to support Microsoft's view that it suffices for the context menu to appear at a place on the screen near where the graphical representation of the selected object appeared immediately before launching the menu and will appear again if the menu is cancelled. That view is hardly un-

---

cused products may themselves include a graphical representation of the selected object, just inside the top border. That possibility is unnecessary to our disposition. Moreover, Microsoft has not pointed to, or sought to rely on, such a possibility regarding the alternative design.

reasonable given the context, which focuses on the experience of users who often will think of what is "under" a menu as still "there," and in which there may be no practical difference between an image that is 80% obscured or faded and one no longer visible at all. But there is not enough to overcome the slightly more natural understanding that a screen image is not in proximity to something not actually on the screen.

We therefore adopt the ALJ's some-visual-persistence construction. Microsoft has not pressed an assertion of infringement by equivalents. Accordingly, there is no basis for disturbing the non-infringement finding for the alternative design.

In short, as to the main group of accused products, with no alternative grounds advanced to support the Commission's non-infringement finding, we reverse that finding. No further issue remains about direct infringement by those products. But the Commission, having rejected direct infringement, did not reach the additional requirements for indirect infringement. Without prejudging the issues raised by those additional requirements in any way, we think it advisable to remand for the Commission to address those issues in the first instance. Also for the Commission to address on remand are the effect of infringement findings—direct infringement already established, indirect infringement possibly to be found on remand—on whether there is a section 337 violation and what remedy is appropriate, on which we likewise state no views. *See Certain Electronic Devices with Image Processing Systems Components Thereof, and Associated Software*, Inv. No. 337-TA-724, 2012 WL 3246515, at *13 (Dec. 21, 2011) (Comm'n Op.)

CONCLUSION

The Commission's determination that Motorola does not infringe the '054 patent is affirmed, as is its determination that Microsoft failed to establish a domestic indus-

try for the '376 and '762 patents. The decision of the Commission finding that Motorola does not infringe the '133 patent is reversed in part, and the matter is remanded.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**